## 28109.   GUNTER *v*. THE STATE.

DECIDED JUNE 26, 1940.    REHEARING DENIED JULY 23, 1940.

*W. L. Hailey,* for plaintiff in error.

*A. S. Skelton, solicitor-general, W. Carey Skelton,* contra.

MacINTYRE, J.   R. J. Gunter was charged with murder, and was convicted of voluntary manslaughter.   His motion for new trial was overruled, and he excepted.

■  It appears from the evidence that the deceased, J. C. Evans, was the defendant's son-in-law, and was living with his wife (defendant's daughter) at the defendant's house at the time the defendant killed him.   About two o'clock in the afternoon of the day of the homicide, Evans returned to the defendant's house in the company of Hobson Vickery.   Soon thereafter the defendant came out of the house, complaining of some one cursing where Evans and Vickery were.   The defendant went to where Evans and Vickery were, with his knife open; and as he approached, Evans reached down and armed himself with a rock.   Both being armed, it was shown by Vickery and others that a mutual combat was engaged in between the defendant and the deceased, which lasted for thirty minutes or more, neither of the combatants, however, receiving any injury.   Evans with Vickery left the scene of this initial difficulty, and was gone about four hours.   According to the testimony of Vickery and to the defendant's statement, Evans left his home for the purpose of arming himself with a gun and shells, with an idea of returning for the purpose of shooting or killing the defendant.   About 6 o'clock p. m. on the same day Evans returned to his home *unarmed,* and as he was about to enter the house he was shot by the defendant.

Alex Temples Jr., the only eye-witness to the killing, testified that he was passing the defendant's house on his way home, and saw the shooting; that he was about fifteen or twenty steps (yards) from the house before the shooting; that he saw Evans coming up the road, and he was about half way between the barn and the house, coming out of the lot going toward the house, and when he "reached the house I noticed that he kinder staggered at the front steps and climbed up the front steps on his hands to keep from

falling;" that the defendant was sitting on the front porch in a chair with a gun, and got up; that Evans and the defendant began quarreling and cursing, and the defendant told Evans that he had to leave the house, and Evans said he was staying and was going to work his crop. "Then I heard Mr. Gunter [defendant] say something about shooting him. . . I couldn't understand what he said. . . And J. C. [deceased] said, he didn't believe he [defendant] would shoot him. Then the gun fired. After he was shot J. C. sorter fell over forward, and he fell flat back." Temples testified also that the deceased said "damn if he believed Mr. Gunter [defendant] would shoot him. The shot was fired when they were six or seven feet apart."

In his statement to the jury the defendant said: "The first start of it, he was out there cussing, and I tried to get him to hush, and it looked like he got louder, and he jerked up that rock to hit me with, and I pulled my knife out. I went back to the house then, and he said something about going off and getting something to kill me with. So he come back that evening. It was dark when he come back, . . about dark. I seed Mr. Temples coming up the road, and he come around. He [deceased] didn't come through the lot gate; he goes around the lot and come up through there cussing and staggering, and he started coming up the steps, and I told him not to come in. He said, 'You gray-headed s. o. a b., I am coming anyhow.' And he told me, 'I am going to kill you,' and staggered and drawed his right hand, and he had a rock in his right hand and started to throw it, and I shot him. I had to do it; if I hadn't killed him he would have killed me. I had to do it. . . Before the start of it he said, 'I am going to get my gun and come back and kill you.' I believe that is all I have to say." The evidence authorized the verdict.

█ Special grounds 1 through 6 complain of the refusal of the judge to grant a continuance on the grounds that "defendant has been in jail and has not had an opportunity to seek counsel and prepare his case," and "defendant is not in such condition physically or mentally that he can safely go to trial." He was tried on July 24, 1939. He had been arrested on June 11, 1939, and he filed a petition to be released on bond. This petition was heard on June 23, 1939, and the same counsel represented the defendant then as represented him on the trial. On the hearing of his motion for

continuance he introduced an affidavit of two doctors, dated June 23, 1939, in which they expressed the following opinion: "This man's [defendant's] physical condition as manifested by the above findings is such as to render inadvisable any prolonged mental strain or stress, and his mental condition is such that he can not make a proper defensive statement in his behalf." An affidavit which had been taken for the purpose of using it at the hearing of the application for bond which occurred approximately a month before the hearing of the motion for a continuance, was introduced. The opinion expressed in the affidavit was based upon treatment and examination of the defendant one or more years before the date of the affidavit. After the solicitor-general had expressed the opinion that the doctors should be placed on the stand, subject to cross-examination, the doctors were subpœnaed by the court and placed on the stand subject to cross-examination, counsel for the defendant stating he did not offer them as witnesses. One of the doctors testified that he had examined the defendant the day before; and in answer to a question as to whether he thought the defendant would ever get any better, he stated: "I think it is doubtful. . . It depends on what care he will take of himself." Q. "Tell the court when this man will be able to go to trial?" A. "I can't tell the court that." The other doctor testified that he attended the defendant a week before, and in answer to a question whether he thought the defendant would ever get well enough to go to trial in this case he stated: "I don't say that." Q. "When do you think he will be well enough?" A. "I don't know." Q. "He has not improved from diabetes and high blood pressure?" A. "Not since I have been treating him." Q. "He has been gradually getting worse?" A. "Yes." Q. "If he has not improved, do you think it possible that he will ever get ready to go to trial?" A. "That is a question. Each individual case is a study in itself." The Supreme Court in *Stovall* v. *State,* 106 *Ga.* 443 (32 S. E. 586), used the following language which we think is pertinent to and applicable to the evidence in this case: "The evidence relating to the physical condition of the accused did not afford any reasonable expectation that he would, at any time in the future, be in a better condition than at the time he submitted his motion. There was no error in the ruling which calls for the interference of this court."

The defendant was present in court, and the judge considered his condition as it appeared, as well as the testimony adduced on the hearing of the motion. Witnesses for the State testified that they saw the ·defendant while he was out on bond, and he appeared to be about the same as he did before his arrest. In a case of this character the good sense, sound judgment, and humanity of the trial judge must be relied on as safeguards against injustice. *Warren* v. *State,* 53 *Ga. App.* 221 (2) (185 S. E. 385); *Rowland* v. *State,* 125 *Ga.* 792 (54 S. E. 694). Nor did the judge err in refusing to allow the trial jurors to hear the evidence concerning the motion for continuance. The motion for continuance was directed to and was to be decided by the court, and was in no wise a function of the jury. The motion was properly overruled.

■ Ground 7 complains of the failure of the court to allow the following testimony of a witness, Hobson Vickery: "Yes, sir, they had some trouble [deceased and Jenkins Elrod]; deceased commenced cussing Jenks and Jenks threw deceased on the ground and held him until he hushed, then we picked˚up deceased, brushed off the dirt—I got him to hush," on the ground that it was admissible to show the deceased's condition shortly after the first altercation and shortly before the second, resulting in the deceased's death; it would show the deceased's state of mind; and was admissible as part of the res gestæ. The general character of the parties, and especially their conduct in other transactions, are irrelevant matter (Code, § 38-202; *Andrews* v. *State,* 118 *Ga.* 1, 3, 43 S. E. 852), and even where it was sought to show a general character for violence on the part of the deceased, in a criminal case for his homicide, this could not be established by proof of specific acts. *Warrick* v. *State,* 125 *Ga.* 133, 141 (5, 6) (53 S. E. 1027). The evidence was properly excluded, and was not admissible for the reasons contended. This ground is not meritorious.

■ Exception in ground 8 is to the disallowing of the following testimony of defendant's witness, Arthur Adams: "I am familiar with the man's [deceased's] reputation for violence in the community. I have heard a good many people say they were afraid to be around when he was drinking; they said they would have to fight him or leave him. I have seen him in a few scraps, and he was to blame for it." The character of the deceased could not be established by specific acts of violence (*Thornton* v. *State,* 107 *Ga.* 683,

687, 33 S. E. 673) ; *Jefferson* v. *State,* 56 *Ga. App.* 383 (5), 192 S. E. 644), and the judge did not err in refusing to enlarge the general rule by permitting the defendant to prove the general character of the deceased for violence and also particular acts. *Pound* v. *State,* 43 *Ga.* 88, 128.

■ Ground 9 complains that the judge erred in charging to the jury the law of manslaughter, because the evidence for the State only made out a case of murder, while the defendant's evidence showed complete justification. Where there is anything deducible from the evidence, or the defendant's statement, sufficient to raise a doubt, however slight, upon the question whether the homicide is murder or manslaughter voluntary or involuntary, it is the duty of the court to charge all grades. *Cain* v. *State,* 7 *Ga. App.* 24 (65 S. E. 1069) ; *Norris* v. *State,* 58 *Ga. App.* 399, 400 (198 S. E. 714) ; *Freeman* v. *State,* 158 *Ga.* 369 (2 *a*) (123 S. E. 126). The defendant's statement was sufficient to warrant such a charge in this case, and the judge did not err in so charging.

*Judgment affirmed. ˚ Broyles, C. J., and Gardner, J., concur.*