### 19043. PHILLIPS *v.* THE STATE.

DECIDED OCTOBER 2, 1928.

*B. F. Walker, E. P. & J. Cecil Davis,* for plaintiff in error.
*M. L. Felts, solicitor-general, J. B. Burnside,* contra.

LUKE, J. Ed Phillips was indicted for murder and was convicted of voluntary manslaughter. The motion for a new trial, based upon the general grounds and upon five special grounds, was overruled, and the defendant excepted.

The following appears from the record: The defendant and M.

A. Newsome were half-brothers and neighbors, living about a mile apart. Newsome had only one arm. On a Saturday night in October, 1927, Newsome, accompanied by his son, Gus, carried the defendant, his wife, and his little boy, in Newsome's automobile, to see Dr. Pilcher, at Wrens, Ga., in order that the defendant's boy might be treated. They arrived at the doctor's at about nine o'clock at night, remained about an hour, and then drove back to Newsome's home, where young Newsome left the party. Newsome then drove the defendant and the defendant's wife and boy home. At about sunup the next morning Newsome was shot in his left side with a pistol. He was taken to Augusta and operated upon. He rallied slightly after the operation, and died Sunday night about fifteen hours after being shot.

■ Special ground 2, complaining that a witness was allowed to testify that he saw something outside of the defendant's gate that was red looking, but which the witness could not say was blood, can not be considered. In the first place, counsel's objection to the evidence was solely in these words: "We move to rule that out;" no reason being given why the evidence should be ruled out. "All evidence is admitted as of course, unless a valid ground of objection is interposed, the burden being on the objecting party to state at the time some specific reason why it should not be admitted. A failure to make such objection will be treated as a waiver, and prevent the court, on a motion for a new trial, from inquiring as to the competency of the evidence." *Andrews* v. *State,* 118 *Ga.* 1 (43 S. E. 852). The principle announced in this decision controls the question under consideration. It is too well established to need further citation of authorities. Furthermore, the court ruled as follows in regard to said evidence: "Unless it is connected up further, it would be inadmissible." It is said in this ground that the evidence was not connected up, was not ruled out, and was harmful to the defendant for stated reasons. If it be conceded that, under the court's statement, the evidence was admitted conditionally, the following rule of law is applicable: "Where the court, over objection, admits certain evidence, with the statement that the objection will be passed upon at a later stage of the trial, it is incumbent upon the objecting party, if the evidence be inadmissible, to direct the court's attention thereto either before or at the close of the testimony, and to move to exclude it; and upon his failure to do this

he will be held to have waived his objection." *Brooks* v. *Ritch,* 31 *Ga. App.* 539 (121 S. E. 136), quoting *Cawthon* v. *State,* 119 *Ga.* 395 (46 S. E. 897). Since it does not appear that subsequently to the court's ruling his attention was directed to such evidence, or that any motion was made to rule it out, the defendant must be held to have waived his objection, even if this court were not precluded from considering this ground for the reason first stated.

■ It is insisted in special ground 3 that the court erred in refusing to allow counsel for the defendant to make a preliminary examination of the witness J. W. Stapleton as to the admissibility of the alleged dying declarations of Newsome before State's counsel finished examining the witness, and before the substance of the declarations was elicited. The court's ruling was as follows: "I don't know of any rule that would allow the defendant's counsel to take the witness away from State's counsel. I will have to overrule the objection at this stage. I will give you a right to interrogate the witness."

In view of the fact that when it is sought to prove dying declarations the court's duty is to determine first from a preliminary examination whether or not such declarations should be admitted to the jury, it would appear to be the better practice for the court to permit both the State's attorney and the defendant's attorney to examine the witness by whom it is sought to prove the declarations, upon the question whether or not they are prima facie admissible, before the substance of the declarations is disclosed to the jury. Indeed, it might be better to allow the jury to retire during the preliminary examination, when the examination could be conducted with less formality, and with no likelihood of injury to either party. It was held in *Duren* v. *State,* 158 *Ga.* 735 (2) (supra), that "The court must judge of the preliminary evidence, in the first instance, and deeming it prima facie sufficient, should admit the declarations to the jury, instructing the jury afterwards to pass finally for themselves on the question whether or not the declarations were conscious utterances in the apprehension and immediate prospect of death." The procedure indicated above appears to be in line with that approved by the Supreme Court in *Campbell* v. *State,* 11 *Ga.* 353, 376.

However, the court's ruling was not reversible error. During his examination the witness Stapleton testified that he saw the de-

ceased an hour and a half or two hours after he was shot; that Newsome had been shot "somewhere about the last rib on the left side;" that he was "in pretty bad condition," and said several times, "I am going to die, I can't live;" that Newsome's mind was clear when he made the statements attributed to him; that he saw Newsome next day and he was dead; that the witness helped the doctor with his examination of the wound; that when he first saw Newsome he was sitting in a chair, and couldn't lie down, and that when he was put on the bed he said, "I can't live, it's killing me." We think that this evidence was sufficient to warrant the court in submitting the statements of the deceased to the jury. Furthermore, the evidence of Dr. Pilcher, subsequently introduced, fully warranted the conclusion that Newsome was in a dying condition when he made the declarations under consideration. Under these circumstances we are quite certain that the refusal of the court to allow counsel for the defendant to examine the witness before the solicitor had concluded his examination worked no injury to the defendant. The substance of the declarations of Newsome, as testified to by Stapleton, appears in these words: "He said Ed shot him, and, 'I had not done anything to him whatever. I was there trying to protect his wife and children and keep him from killing them.'" Note, in this connection, the following ruling, made in the early case of *Dumas* v. *State*, 62 *Ga.* 58, and quoted approvingly in *Duren* v. *State*, supra: "That declarations offered in evidence as dying declarations were made under the belief that the wound was mortal and death impending may be inferred from the nature of the wound, and other circumstances, though nothing direct was said respecting death or danger."

■ Special ground 4 of the motion for a new trial complains of the court's refusal to rule out the testimony of the witness Sam Jones as to declarations made by Newsome, for the reason that at the time they were made it did not appear that Newsome was in articulo mortis, or that he believed that he was going to die. Jones testified that Newsome, on his way home, at about seven o'clock in the morning on which he was shot, drove his automobile within about thirty yards of his (Jones's) house, and "couldn't get any further;" that he "was hollering," and called witness out to give him a drink of water; and that he asked witness to carry him home. The witness testified further as follows: "I asked him what

was the matter, and he says, 'Oh Lord, I am shot.' I says, 'Who shot you?' I asked him three times, and he says, 'Ed.' And I says, 'Why did he shoot you?' And he didn't tell until we got nearly to the road, and he said he was trying to keep him out of the house with a gun, and 'he shot me.'" Witness drove Newsome home in his (Newsome's) car, and helped carry him in the house. Newsome could not lie down and sat in a chair. When Newsome first drove up near the house of the witness he said, "Oh, Lord, help me; give me a drink of water." Witness saw blood on Newsome's left side.

It may be added here that Dr. Pilcher, who examined Newsome shortly after Jones carried him home, subsequently testified as follows: "I saw Gus Newsome on Sunday about eight o'clock, and he was wounded, pistol wound in the abdomen. He was seriously wounded. . . That wound produced his death. The ball passed through the left side, going through the pan, and landed in the soft tissue of the right side. . . He asked me if I thought he was going to die, and I told him I thought he was seriously wounded. . . After the incision, I knew he would have to die. When I got to him, he stated that Ed Phillips shot him; and I asked him why, and he stated that he did not know. . . He said they were not in a fight. There were some powder burns around the wound. There were some excoriations, a small area about like that (indicating). That indicated . . close range. . . He was in a dying condition, but not dying. He was in an actually dying condition at the time he made those statements to me, and did actually die from those conditions in twelve or fourteen hours. . . This man was in a dying condition, but that condition had not progressed quite far enough for the heart to cease beating." In this connection see *Dumas* v. *State*, and *Duren* v. *State*, supra.

In special ground 5 it is insisted that the court erred in over-ruling counsel's motion, made after all the evidence was in, to "rule out all the evidence regarding a dying statement, or as to a dying statement," for the alleged reason that Newsome was not shown to have been in articulo mortis and to have abandoned all hope of living. Besides the witnesses, Stapleton, Jones, and Dr. Pilcher, whose testimony has been considered, four other witnesses testified to Newsome's declarations, and it does not appear from the record that the testimony of any of said four witnesses was

objected to. Clearly this court can not pass upon this blanket motion to rule out the evidence of seven witnesses, when the ground neither gives the name of any witness nor his testimony.

■ We shall now consider the first of the special grounds of the motion for a new trial. It is that the court committed error in charging the law of voluntary manslaughter, because there was nothing in the evidence, or in the defendant's statement, or in both together, to authorize the charge. In addition to the evidence already stated, we quote from the testimony of Albert Rivers, as follows: "I observed a bruise on his [Phillips'] head. . . It was not so bad. . . I saw a scratch. . . I blowed, . . and he (Phillips) came out of the house. . . I am familiar with the premises around Phillips' house. . . I remember that there is a lightwood fence, sawed pickets." Another witness testified that the pickets in the fence were about 1 inch by 1 inch by 3 or 3-½ feet. The defendant's statement follows: "I had just taken my wife and little boy to Wrens to see Dr. Pilcher. I came on back home, and he was drinking; and I asked him to go to bed, and he says, "No, I am going to Pan Handle and raise hell." We walked out in the yard. He says, "I will go up yonder and get Flora to stay with your wife. I says, 'No, I can't go, I don't want her down here with my wife.' He says, "She is as good as your wife or anybody else's," and he commenced to beat me here and here [indicating] with a paling, and I shot him. He didn't fall, and walked out to the well and got a drink of water. Later he cranked up his car and left. Later they taken me to jail at Warrenton. Mr. Whitley and Dr. Davis saw these wounds, and are here in court subpœnaed by me, and will testify as to these wounds."

Bearing in mind that Newsome had only one arm, and that the blows inflicted upon defendant appear not to have been at all serious, and that the "paling" defendant says Newsome began to beat him with was not shown to have been a deadly weapon, we are quite sure that it was the duty of the court to charge the law of voluntary manslaughter. The law controlling this feature of the case is well expressed in the case of *Brown* v. *State,* 10 *Ga. App.* 50 (supra) in the following language: "On the trial of an indictment for murder, where the offense of voluntary manslaughter is reasonably deducible from the evidence or the defendant's statement to the jury, considered separately or together, a charge on the law of vol-

untary manslaughter, and a verdict for that offense, were authorized." See *Grinstead* v. *State*, 37 *Ga. App.* 118 (139 S. E. 120).

■ The evidence authorized the conviction, the court did not err in overruling the general grounds of the motion for a new trial, and for no reason assigned was error committed.

*Judgment affirmed. Broyles, C. J., and Bloodworth, J., concur.*