## 22239. HOUSE *v.* THE STATE.

Decided June 14, 1932.

*Tutt & Brown,* for plaintiff in error.

*A. S. Skelton, solicitor-general, Clarke Edwards Jr., C. E. Sutton,* contra.

LUKE, J. The indictment in this case charges that on July 22, 1931, in Elbert county, Ga., R. M. House did make an assault upon P. C. Johnson, and did kill the said Johnson by shooting him with a pistol, and that the killing was murder. The jury found the defendant guilty of voluntary manslaughter and fixed his punishment at from one to two years in the penitentiary. The trial judge overruled the defendant's motion for a new trial, and the movant excepted.

Sandy Thurman testified, in substance, that on July 22, 1931, he came to Elberton with P. C. Johnson and a Mr. Anderson in Tom Walters's automobile; that witness, at Johnson's request, parked the car on a public street near where defendant's automobile was parked; that after witness and his companions had gotten out of their car, defendant came out and invited Johnson "to come out there;" that defendant and Johnson went up the street together talking, but that witness did not hear what they said or where they went; that defendant then got in his car and left with Mrs. Lilly Watts and a Mrs. (or Miss) Stragan or Stribling, going in the direction of Mrs. Watts's home; that the deceased told witness that he came to Elberton "to see about his cow out at Mrs. Lilly Watts's;" that when the defendant left, witness stayed at the automobile and Johnson and Anderson went up town; that when Johnson and Anderson returned to the automobile Johnson wanted to go out to Mrs. Watts's home, and witness drove him there in the automobile; that when they reached Mrs. Watts's she and the defendant were standing near the pasture gate; that Johnson went towards House, and that witness, who was about sixty yards away, heard Johnson tell House he had "told a damn lie;" that Johnson kept walking,

and defendant started towards Johnson; that Johnson had his left hand "in front of his bosom," and his right hand was hanging down; that when said parties were within about ten feet of each other the defendant shot in Johnson's direction five times with a pistol; and that Johnson turned around, and witness ran away.

Arch Crocker testified, in part, that on the day in question he parked his car near that of the defendant on a street of Elberton; that he had a pistol in his car, that when he returned to the car the pistol was gone; and that the pistol exhibited to him was his pistol. Robert Loyd testified that he saw the defendant get a pistol out of Crocker's automobile and go towards Johnson at the time both of these parties were in Elberton. Charlie Johnson, a policeman of Elberton, testified that the defendant surrendered to him in said city at about eight o'clock of the night of the homicide; that defendant said that he shot Johnson, but that he had to do it; that the defendant told witness at the time of the arrest that the pistol was in defendant's car, and that witness got said pistol—the same one that was exhibited to witness on the stand; that defendant said he took the pistol away from Johnson and shot Johnson with it, but on the next day the defendant said that he wanted to correct his former statement by stating that he did not take the pistol from Johnson, but borrowed it from another fellow; and that defendant said that Johnson started on him with an open knife and threatened to kill him, and that, after shooting two or three times to scare Johnson, and Johnson would not stop, defendant "shot to hit."

Several of the witnesses sworn for the defendant testified that the State's witness Sandy Thurman was not worthy of belief, and others testified that the deceased was a dangerous character. The testimony adduced in behalf of the defendant contradicted the testimony of some of the State's witnesses. For the purpose of this decision we see no occasion to state at length the testimony adduced in behalf of the defendant. We shall, however, quote briefly from the defendant's statement to the jury as follows: "He said, 'You are a damn liar . . I will kill you.' And I turned around . . and I walked back apiece, and he pulled his knife out. And I said, 'Don't you come on me, I will hurt you.' And I decided I didn't want to hurt him—didn't want to kill him, . . and I shot to the side of him two or three times; and he kept advancing, and I stopped and said, 'Stop.' I didn't aim to advance any further,

and he kept coming on, and me shooting at him. I tried to hit his legs. . . And he kept coming on, and I knowed I would have to do something, and I plugged him in the breast. . . I had to back out of the way to keep him from cutting me." We will also state that it appears, from the statement of the defendant, that Johnson pursued him in Elberton and tried to bring about a difficulty there shortly prior to the shooting. It is inferable from the brief of evidence that the difficulty arose out of some business transaction, the nature of which does not clearly appear.

If the deceased cursed the defendant as vilely as the defendant says he did, and, without provocation, started upon defendant with an open knife, and the defendant shot the deceased once in the hand and once near the heart, killing him, as the record shows he did, we see no reason whatever which would warrant this court to say that the evidence does not support the verdict. In a case very similar to the one at bar (*Lamp* v. *State*, 38 *Ga. App.* 36, 142 S. E. 202), this court said: "A conviction of voluntary manslaughter was authorized by a part of the defendant's statement, from which it appeared that, without provocation, the deceased, on meeting him, cursed him and threatened to cut his throat, and immediately advanced upon him with a knife, and that the defendant thereupon shot and killed the assailant." We are aware that, according to the defendant's statement, notwithstanding the vile cursing that Johnson was inflicting upon him, and notwithstanding the attack with the knife, the defendant acted with the utmost coolness. However, it is well settled that a jury has the right to believe a part of the defendant's statement and to reject other parts. See *Lamp* case, supra. Again, it appears from the State's evidence that the deceased called the defendant a liar, and that the parties were mutually advancing upon each other, defendant with a pistol and deceased with a pocket-knife, when the defendant quickly discharged his pistol five times in Johnson's direction, striking him once in the hand, and once near the heart. We hold that the evidence abundantly supports the verdict.

Special grounds 1, 2, and 3 of the motion for a new trial all aver that the charge upon voluntary manslaughter was not warranted by the defendant's statement or the evidence, and that it was reversible error for the court to instruct the jury upon the law of voluntary manslaughter. As indicated by our ruling upon the gen-

eral grounds, we disagree with the contention made in these three special grounds. "On the trial of an indictment for murder, where the offense of voluntary manslaughter was reasonably deducible from the evidence or the defendant's statement to the jury, considered separately or together, a charge on the law of voluntary manslaughter, and a verdict for that offense, were authorized." *Phillips* v. *State,* 38 *Ga. App.* 648 (5) (145 S. E. 106), quoting *Brown* v. *State,* 10 *Ga. App.* 50 (72 S. E. 537). See also *Lamp* v. *State,* supra, which appears to be directly in point both as to facts and law. We hold that the court did not err in charging the law of voluntary manslaughter, and that the first three special grounds were properly overruled.

The last special ground avers that the court erred in charging the jury as follows: "If you believe from the evidence that the defendant, at the time of the killing, acted under the fears of a reasonable man that a felony was about to be committed by the deceased on him, and that the defendant shot in good faith, and not in a spirit of revenge, to prevent the commission of such felony, and if you believe that the circumstances, as they appeared to the defendant at the time, were sufficient to excite the fears of a reasonable man that the deceased was about to commit a felony on him, and that he shot in good faith, and not in a spirit of revenge, but to prevent the commission of such felony, you should not find the defendant guilty of murder. If, however, in such a case the deceased intended to commit, not a felony, but only a trespass or misdemeanor, then to kill under those circumstances is manslaughter."

The first criticism of this charge is that the court erred in charging the jury that under the circumstances stated they "should not find the defendant guilty of murder," it being urged that he should have instructed the jury that "they should acquit the defendant."

We agree with counsel that the court should have instructed the jury that, under the circumstances stated, "they should acquit the defendant." However, it is quite true that, under said circumstances, the jury "should not find the defendant guilty of murder." In the light of the court's very favorable charge to the defendant, and especially in view of the fact that the judge had just clearly and concisely instructed the jury that it would be their duty "to return a verdict of not guilty" under the circumstances stated in the

quoted excerpt, we are of the opinion that the jury could not have been misled by the phrase referred to.

The criticism referred to above is merely made more specific by the insistence that the effect of the court's charge was "to instruct the jury that they might, nevertheless, find the defendant guilty of manslaughter under the circumstances which made out a perfect defense of justifiable homicide." The court charged fully and correctly the law of "reasonable fears," justifiable homicide, and manslaughter, and we do not think that any juror of ordinary intelligence could have been misled as indicated. We hold that the fourth and last ground discloses no reason for reversing the judgment, and that the court did not err in overruling that ground.

*Judgment affirmed. Broyles, C. J., concurs. Bloodworth, J., absent on account of illness.*